# IN THE COURT OF APPEALS OF IOWA

No. 17-2082
Filed May 2, 2018

**IN THE INTEREST OF D.S.,**
**Minor Child,**

**D.S., Minor Child,**
　　　Appellant.
_____

　　　Appeal from the Iowa District Court for Johnson County, Jason A. Burns, District Associate Judge.


　　　A child, through his attorney, appeals the permanency order entered by the juvenile court placing him with his father. **AFFIRMED.**


　　　Natalie H. Cronk of Cronk & Waterman, P.L.C., Iowa City, for appellant minor child.

　　　Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

　　　Amy L. Evenson of Larson & Evenson, Iowa City, guardian ad litem for minor child.


　　　Considered by Danilson, C.J., Bower, J., and Mahan, S.J.*

　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**MAHAN, Senior Judge.**

A child, through his attorney, appeals a permanency order entered by the juvenile court placing him with his father. Upon our review, we affirm the court's order.

## I.  *Background Facts and Proceedings*

In January 2016, D.S. and his sibling were removed from their mother's care upon reports of abuse on the children; the mother was charged with child endangerment and violation of a no-contact order stemming from the incident. D.S. was placed in family foster care under the custody of the department of human services (DHS), where he has remained since removal.

The father was first served notice of these proceedings on February 9, 2016. The father, who lives in Mississippi, was not listed on the child's birth certificate, but the parties did not dispute he was D.S.'s biological father. Although the father and mother ended their relationship before the child's birth in 2007, they had been in contact over the years and the father consistently paid child support for D.S.

The child was adjudicated a child in need of assistance later that month; the father did not appear at the hearing. On March 3, 2016, the father filed a financial affidavit and request for counsel; the court entered an order appointing counsel that same day. Through his attorney, the father filed a motion for an interstate compact home study and a request for services, including initiation of contact with D.S. The father participated in the hearings that followed. He began visiting the child in the summer of 2016, and he had contact with the child through written correspondence and phone calls.

The father continued to reside in Tupelo, Mississippi, where he was born and raised. The father has a large family support network in Tupelo. He lives with his sister and her children in a house owned by their mother. He has worked for the same employer since 2012. The father has six other children whom he pays child support for; the father has contact with all but one of those children, attends their sporting events, and participates "in their everyday lives" in Mississippi. The father volunteers for his church and coaches youth football. He is described as "soft spoken," "selfless," "patien[t]," "supportive," and "hard work[ing]."

In March 2017, the Mississippi home study resulted in a denial of placement. This conclusion was based in part on defects in the home study—including use of the wrong date of birth for the father (which resulted in reporting an incorrect criminal history) and the wrong date of birth for the child—as well as the father's failure to respond accurately to some questions on the study.[1] Service providers agreed "that it was a very poor home study" and another should be ordered, but there was no telling how long that would take. As of December 2017, another home study had yet to be completed.

Meanwhile, the court extended the permanency goal of reunification for six additional months several times. The mother remained without stable housing or employment, but she engaged in semi-supervised visits with the child. During the course of this proceeding, the child understandably "change[d] his mind frequently" about where he wanted to live, including with his mother, with his half-sister and

---

[1] When answering social history questions, the father's girlfriend was not living with him; he reported she moved in during the pendency of the home study. The father also failed to disclose his minor criminal history prior to 2008, which he acknowledged was a "mistake on his part."

her father in Indiana, with his father, and with his foster family. D.S. has explained that he likes his father and his foster parents both "110%" and, although he felt comfortable in his school and current placement, he desired the court make the placement decision for him. After an extended visit to Mississippi in the summer of 2017, D.S. reported he had a "lot of fun" and he wanted to live with his father. At that point, the child's attorney and guardian ad litem requested her role be bifurcated and a new guardian ad litem be appointed to represent D.S. The court granted that request.

The permanency hearing took place over two days in September and December 2017. The court granted the foster parents' motion to intervene. They expressed an interest in adopting D.S. if his parents' parental rights were terminated. The father requested the child be placed with him, and he indicated he was ready and able to care for the child in Mississippi. The State and the guardian ad litem recommended the court place the child with the father. DHS recommended termination of parental rights but acknowledged its recommendation was premised on the child's need for permanency and the fact that the Mississippi home study was still incomplete. The mother opined the child should be placed with the father if he could not be returned to her care. The child's attorney recommended termination of parental rights, or alternatively, a guardianship with the foster parents. The foster parents requested the court establish a guardianship.

The juvenile court entered its permanency order on December 18, 2017. Having determined termination of parental rights is not in the child's best interests at this time and that "the mother is not a safe and stable placement for the child at

this time," the court proceeded to the question of whether placement with the father is a safe option that would serve the child's best interests. Ultimately, the court ordered custody of the child to be placed with the father and changed the permanency goal to "remain with father." The court ordered the effective date for the transfer of custody to take place between December 22, 2017 and January 12, 2018, in order "to allow the child to finish school and prepare for the move to Mississippi." The court further ordered the father to enroll D.S. in school, maintain insurance for D.S., and arrange therapy for D.S. in Mississippi.

The child's attorney appealed the permanency order. The child's attorney also filed a motion to stay the proceedings. On December 28, the supreme court ordered the matter "temporarily stayed pending further order of this court" and allowed the parties until January 5 to respond to the child's attorney's motion to stay. The State and DHS filed a collective response requesting the motion for stay be granted, pointing out "Iowa DHS has a request currently pending before the State of Mississippi for a new home study," but Mississippi "has not yet issued an approved home study," which was needed in order for DHS to approve D.S.'s placement with the father.

The father resisted the motion to stay and requested "custody of the child be transferred to [him] as ordered." The guardian ad litem also filed a resistance to the motion for stay, opining, "If a stay were granted pending the appeal, this would delay the child moving schools and integrating into his new home and family. This is clearly not in the child's best interests."

On January 9, the supreme court entered an order denying the motion to stay. The court transferred the case to this court. Additional facts will be discussed below as are relevant to the issues raised on appeal.

## II.     *Standard of Review*

We review permanency orders de novo. *In re K.C.*, 660 N.W.2d 29, 32 (Iowa 2003). We give weight to the juvenile court's findings of fact but are not bound by them. *Id.* The child's best interests are our paramount concern. *Id.*

## III.     *Consideration of the Father as a "Parent"*

The child's attorney challenges the court's consideration of the father as a "parent" within the meaning of Iowa Code chapter 232 (2016). Specifically, the child's attorney contends the juvenile court erred by "improperly considering [the] unestablished biological father as [a] 'parent' where the child was born out of wedlock and [the] biological father did not acknowledge paternity within a reasonable amount of time."

This claim was neither raised before, nor addressed by, the juvenile court. *See Benavides v. J.C. Penney Life Ins. Co.*, 539 N.W.2d 352, 356 (Iowa 1995) (holding an issue must be presented to and passed upon by the trial court before it may be raised and adjudicated on appeal). We determine this issue has not been preserved for our review. Moreover, even if error had been preserved on this claim, it is unpersuasive. *See* Iowa Code §§ 232.2(39) ("'Parent' means a biological or adoptive mother or father of a child; or a father whose paternity has been established . . . by administrative order when authorized by state law."), 232.104(2)(d)(2) (allowing for "[t]ransfer of sole custody of the child from one parent to another parent").

### IV.    *Permanency Order*

The child's attorney challenges the juvenile court's failure to make a determination that termination of parental rights was not in the child's best interests before entering the permanency order. *See id.* § 232.104(4)(a) ("Prior to entering a permanency order pursuant to subsection 2, paragraph 'd,' convincing evidence must exist showing . . . [a] termination of the parent-child relationship would not be in the best interest of the child."). Specifically, the child's attorney contends,

> While the juvenile court found that D.S. could not be returned home under [section] 232.104(2)(a) and continued placement was not an option under [section] 232.104(2)(b), the court failed to direct the filing of a termination of parental rights or explain why termination would not be in the child's best interest before proceeding under [section] 232.104(2)(d).

This claim is not supported by the record. At the permanency hearing, the court repeatedly acknowledged termination of parental rights as a potential issue, and the court received the parties' respective positions on the issue. The question before the court turned to whether placement with the father was in the child's best interests,[2] but only after the court concluded termination of parental rights was not in the child's best interests at that time:

> The Court declines to order the State or any party to file a termination of parental rights petition. The Court has serious doubts that any ground for termination exists by clear and convincing evidence. Neither parent has abandoned the child as they have not evidenced any intent to abandon the child and both seek custody. While the children were removed initially due to concerns of physical abuse, there is no evidence that either parent poses a current risk of physical abuse to the child. The father has not been accused of any child abuse, and no evidence has been presented that there is any risk of physical abuse if the child was in his care. The evidence

---

[2] At the permanency hearing, DHS recommended termination of parental rights. By the time of this appeal, however, DHS joined the State's recommendation that termination of parental rights was not in the child's best interests.

regarding the risk if returned to the mother is not as clear, but she has received services for almost two years in this case. The Court is not presented with any indication that the receipt of services was not effective; and the FSRP reports do not include any significant, recent safety concerns.

The child's attorney states that a termination petition would also be supported under the theory that the father has not maintained significant and meaningful contact with the child under Iowa Code section 232.116(1)(e). The father has not taken advantage of every opportunity to be actively involved in [D.S.]'s life, but he has made an effort to be involved within the past year. He has made a genuine effort to complete the requirements of the case permanency plan and to complete the orders of the Court. The Court must also recognize the significant barriers between the father and the child due to distance and financial constraints. In an ideal world, the father would have been able to visit the child more often. Reality, however, does not make this a possibility. It is true that the father should have made more of an effort to call or write to the child, but he has made some efforts. Most significantly, he has done visitations in Iowa and Mississippi when possible, and he has made a genuine effort to complete the expectations of the permanency plan and the Court. He attempted to complete the home study, and the issues raised regarding the home study do not appear to be wholly attributable to the father. Though somewhat belated, he has made the necessary inquiries regarding school, insurance, and counseling for the child, despite his limited financial means.

Likewise, the Court has doubts about whether termination would be appropriate under Iowa Code section 232.116(1)(f), 232.116(1)(i), or 232.116(1)(*l*). The Court again points to the lack of any indication that the father, or even the mother at this point, continues to pose a safety concern to the child. While the mother cannot currently provide a safe home for the child, the evidence is that the father has the capability to provide a safe home and has an extensive network of family to assist. There is also no evidence, currently, that any parent suffers from a diagnosed mental health or substance abuse condition.

The Court understands that the permanency hearing was not a trial on a petition to terminate parental rights and there may be different evidence presented at such a hearing than what was offered here. The preliminary considerations of the grounds for termination listed above are not intended to be a ruling of the applicability of those grounds to a possible future termination petition. The comments above are simply intended to demonstrate the lack of a clear ground presented at the permanency hearing.

Though the Court has indicated a lack of an obvious ground for termination, the real evidence weighing against termination is that there is a parent who is ready, willing, and able to take the child into

his custody. The bulk of the argument of those in favor of termination seems to be that one group of people, the foster parents, are "better" parents than the child's biological parents and therefore a return to a biological parent would not be in the child's best interest. There is an obvious danger to this line of reasoning. The Court has removed the child from a biological parent due to a specific concern. The child was at imminent risk when he was taken from his mother and placed into the custody of the State. Like so many parents who come before the Court, this child's parents come from limited financial means. A parent in this situation may still have the capability of providing a nurturing home for the child. Many of the people who open their homes to children in need as foster parents are at the opposite end of the financial spectrum. There is a danger in comparing financial stability, and all of the associated benefits, in making a "best interests" determination. If there is a biological parent who is able to take care of the child with no safety concern, then that is who should parent the child. To view it otherwise would lead to a system where children, who often come from homes that struggle financially, are removed and placed into wealthier homes where they remain indefinitely. There is a statutory preference for placement of children with relatives during the child-in-need-of-assistance proceedings. *In re N.V.*, 877 N.W.2d 146 (Iowa Ct. App. 2016). This statutory framework demands that relative placement be considered before non-relative placement. It codifies the approach of this Court—when possible, children should be with their parents.

Contrary to the claim of the child's attorney, we conclude the court made detailed findings on whether termination of the parent-child relationship would not be in the best interests of the child. *See* Iowa Code § 232.104(4)(a). We affirm on this issue.

## V.    *Preference for Relative Placement*

The child's attorney claims the juvenile court erred in giving preferential status to relative placement at the permanency stage, rather than focusing solely on D.S.'s best interests. Specifically, according to the child's attorney, "Even assuming the court properly employed the permanency framework in determining termination of parental rights was not appropriate, the court erred when it

improperly analyzed permanency under [section] 232.104(2)(d) and afforded the biological father preference superior to and contrary to the best interests of D.S."

Indeed, the child's best interests govern the ultimate decision of the court in determining placement of the child in a child-in-need-of-assistance case. *See In re D.W.*, No. 07-1028, 2007 WL 2492454, at *3 (Iowa Ct. App. Sept. 6, 2007) ("In considering a long-term placement for a child, the child's best interests must prevail."). But there is "a statutory preference for placement of children with relatives during the child-in-need-of-assistance phase of the proceedings." *N.V.*, 877 N.W.2d at 152; *see* 42 U.S.C. § 671(a)(19) (requiring the State to "consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child"); *see also In re X.O.*, No. 16-0313, 2016 WL 2743445, at *3 (Iowa Ct. App. May 11, 2016) (same); *In re R.B.*, 832 N.W.2d 375, 381 (Iowa Ct. App. 2013) (same). Moreover, "[t]here is a rebuttable presumption that the child's best interests are served by parental custody." *In re N.M.*, 528 N.W.2d 94, 96 (Iowa 1995).

The child's attorney contends, "The court's reliance on *In re N.V.* is misplaced in the permanency context," and points to the court's ruling in *D.W.* as support for its claim. *See D.W.*, 2007 WL 2492454, at *3 ("We believe that under section 232.104(2)(d), a relative should be given the same consideration as any other 'suitable person' and is not entitled to preferential status."). Insofar as this court's recent decision in *N.V.*, 877 N.W.2d at 152, is at odds with the court's prior unpublished decision in *D.W.*, 2007 WL 2492454, at *3, we believe the court's reasoning in *N.V.* is persuasive and in line with controlling authority, *see* 42 U.S.C.

§ 671(a)(19), as well as more applicable under the facts of this case.[3] *See X.O.*, 2016 WL 2743445, at *3; *R.B.*, 832 N.W.2d at 381 ("[T]here is no better place to begin the search for relatives than with the parents themselves."). We affirm on this issue.

## VI. Best Interests

The child's attorney further contends, "Even if the court properly gave preferential status to [the] biological father at permanency," the court's permanency decision is not in the best interests of D.S. Specifically, the child's attorney claims the court's "conclusions regarding [the] biological father's safety and stability are not supported by this record."

We acknowledge the father had literally no involvement in the child's life until after the child's removal from the mother's care in 2016. The mother admitted she never contacted the father about D.S., she never made any effort to involve the father in D.S.'s life, and she did not provide the father's name or contact information to DHS during prior proceedings involving the children, despite the facts that the father consistently made child support payments for D.S. and the mother and father were in contact with each other "off and on," approximately every "six months." However, since the father received legal notice of the child-in-need-of-assistance proceedings in Iowa, he worked to establish a role in the child's life, notwithstanding significant logistical and financial barriers. At the permanency

---

[3] As the State points out, *D.W.* concerned a relative placement rather than a non-custodial parent placement, and termination-of-parental-rights proceedings had been initiated in *D.W. See* 2007 WL 2492454, at *1-3. *N.V.* concerned a relative placement with the child's great aunt or grandparents versus a non-relative placement with a daycare provider. *See* 877 N.W.2d at 151-52.

hearing, the mother testified she "w[ould] rather [D.S.] be with his father" if the court determined D.S. could not be returned to her care.

We acknowledge concerns with regard to the father's arrest for possession of marijuana on his drive back from Iowa in January 2017, but we observe the father pled guilty to the charge and paid the fine. The father admitted to using marijuana recreationally, but he testified, "I can give it up. . . . [I]t's not a habit or anything." He stated he had not used marijuana since September 2017, and he would not use marijuana if D.S. was in his care. The father testified he took a drug test in November 2017, which came back negative.

The child's attorney also claims the father "had not sought corrections to the [Mississippi] home study to assist the court in ascertaining his appropriateness for placement." To the contrary, the father testified he and his attorney had attempted to contact the Mississippi DHS with regard to the home study, but they "haven't . . . received a call" and they "can't get any contact with [any]one." The situation regarding the Mississippi home study is troubling, and, unfortunately, we believe it stifled the amount of progress the father and D.S. could have made sooner in this case.[4] The Mississippi home study was completed in March 2017, "roughly a full year" after it was requested. Moreover, the home study recommended denial of

---

[4] The State acknowledges in its brief:

> Despite the State of Iowa's best efforts, the State of Mississippi had not yet issued an approved home study on D.S.'s father's home. As such, DHS cannot recommend immediate placement of D.S. with his father.
>
> . . . .
>
> [However], the State would note as a practical matter that, given this Court's denial of the Appellant's request for a stay, Iowa DHS complied with the juvenile court's permanency order, and D.S. moved to his father's home in Mississippi on January 13, 2018. D.S. is now enrolled in school in Mississippi. Iowa DHS continues to monitor this placement by staying in touch with D.S., D.S.'s father, and D.S.'s school.

the father as a placement option, but the recommendation was due to defects in the home study, including use of the wrong date of birth for the father (which resulted in reporting an incorrect criminal history) and the wrong date of birth for the child. The Iowa caseworkers were in agreement "that it was a very poor home study" and another one should be ordered, but there was no telling how long that would take. The Iowa DHS caseworker acknowledged the father's contact with the child waned temporarily after the home study was denied, but she explained, "I could see that as being discouraging to somebody." She further explained the father reinitiated his involvement: "I see it as someone who said, oh, maybe I misunderstood, and maybe I should go back to doing what I was doing."

The father made efforts to travel from Mississippi to Iowa to attend court hearings and to visit D.S.—most recently over Thanksgiving weekend in November 2017, when the father made two round trips between Mississippi and Iowa to take D.S. to Mississippi to spend the holiday with his family.[5] D.S. also took an extended visit with the father in Mississippi over the summer. The father communicated with health providers in Mississippi to arrange for medical and therapy appointments for D.S., and he made arrangements for D.S. to have insurance coverage. The father visited the local middle school to organize the documents necessary to enroll D.S. after winter break in January 2018, and he planned for D.S. to attend the boys and girls club after school, where D.S. had enjoyed spending time when he visited during the summer. The father had

---

[5] We particularly commend the father's efforts in this regard considering he became ill during the weekend with the flu, including sustaining a high fever over several days.

appropriate housing, a steady job, and a familial support network. As the juvenile court found:

> [The father] has asked the Court to place [D.S.] with him. The Court has a parent who is willing and able to take the child, and nothing suggests that the child would be placed at risk of harm if placed there. The best interests of the child determination requires a balancing of the benefits of a family placement and the placement of a child into a perhaps more stable foster home. The Court believes, consistent with the statutory preferences, that the benefits of a family placement in a home with no safety concerns outweighs the other benefits presented in keeping the child in foster care.

We concur with the juvenile court's determination, including the court's finding that "there are no safety concerns with the father." The DHS caseworker opined the father "is committed to [D.S.]," and he "step[ped] up [to] be a dad" as soon as he realized the court was involved. In sum, the father is ready, able, and willing to meet the needs of D.S.; has made an effort to be there for D.S.; has attended visitations which have gone well; and has a support network in place to help raise D.S. On our de novo review of the evidence, we determine placement of D.S. with his father was in the child's best interests, and we affirm the permanency order entered by the juvenile court.

**AFFIRMED.**